QUIÑONES, PROMOVENTE Y APELANTE, *v.* CÁMARA, OPOSITOR Y APELADO.

No. 2724.—*Visto:* Febrero 8, 1924. *Resuelto:* Junio 10, 1924.

TESTAMENTO DE PALABRA ANTE CINCO TESTIGOS—INMINENTE PELIGRO DE MUERTE.
—El requisito exigido por la ley para que una persona pueda otorgar testamento de palabra ante cinco testigos sin la presencia de un notario es que se halle en peligro inminente de muerte, el cual debe ser de tal naturaleza que razonablemente no dé tiempo según las circunstancias para utilizar a un notario porque la muerte puede ocurrir prontamente, en poco tiempo, pero el hecho de que exista un peligro inminente de muerte es bastante por sí solo para prescindir del notario aunque haya alguno en la localidad y aunque resida cerca de la persona que se halle en tal condición.

ID.—ID.—En el presente caso *se resolvió:* que aunque la existencia de notarios en la localidad por sí solo no es motivo para que no pueda otorgarse testamento de palabra en caso de peligro inminente de muerte, sin embargo, el hecho de que había notarios en la localidad y de no utilizarlos, con otros hechos tendieron a probar que el peligro de muerte no era inminente.

ID.—ID.—DISCRECIÓN JUDICIAL.—Cuando a juicio del tribunal sentenciador no resulta probado que el testador estuviese en las críticas circunstancias que exige el artículo 709 del Código Civil, el testamento ante cinco testigos es nulo.

ID.—ID.—ID.—En el procedimiento para elevar a escritura pública el testamento hecho de palabra ante cinco testigos, si la prueba no le merece crédito, el juez no está obligado a decidir de acuerdo con las manifestaciones de testigos y peritos que la testadora estaba en inminente peligro de muerte al otorgar testamento.

SENTENCIA de *Angel Acosta*, J. (Mayagüez), declarando sin lugar solicitud interesando se eleve a escritura pública un testamento de palabra, con costas. *Confirmada.*

*A. Arnaldo Sevilla*, abogado de la apelante; *J. Sabater* y *J. Hernández López*, abogados del apelado.

EL JUEZ ASOCIADO SEÑOR ALDREY, emitió la opinión del tribunal.

Doña Buenaventura María Filomena Quiñones y Silva, conocida por Filomena Quiñones de Quiñones, murió en el pueblo de San Germán de esta Isla el 29 de noviembre de 1921 a los 90 años de edad sin tener herederos forzosos y el 12 de diciembre siguiente su sobrina doña Mary Quiñones compareció ante el Tribunal de Distrito de Mayagüez alegando que en peligro de muerte dicha señora otorgó testamento de palabra ante cinco testigos, que fué reducido a escrito, y que por su interés en él como legataria solicitaba se declarase ser su testamento. A esa petición se opuso Fray Angel Cámara en su carácter de albacea testamentario de la difunta y oídas las pruebas que las partes presentaron el tribunal negó la petición de doña Mary Quiñones, quien interpuso este recurso de apelación y compareció para sostenerlo.

Los motivos que tuvo el tribunal inferior para no declarar testamento de doña Filomena el otorgado ante cinco testigos, fueron: que doña Filomena no estaba en inminente peligro de muerte el 16 de noviembre de 1921 cuando otorgó

el testamento de palabra ante los cinco testigos: que si bien dichos testigos son idóneos y presenciaron el testamento, sin embargo, por la forma en que fueron citados, por su manera de declarar, por la forma en que se reunieron y por sus condiciones, no han llevado al tribunal la credibilidad y certeza moral necesaria para producir en él una convicción y tener sus declaraciones como la última voluntad de dicha señora: que mientras la testadora hablaba Cheo Quilinche tomaba notas que él dictaba a Nadir Gutiérrez, quien escribía las disposiciones testamentarias, resultando así que la testadora no dijo su última voluntad a los testigos sino a Cheo Quilinche, que no figura como testigo del testamento: que en San Germán residen cuatro notarios, sin que haya prueba de la imposibilidad de buscar a cualquiera de ellos para el testamento, habiendo doña Filomena utilizado mes y medio antes a uno de ellos para otorgar un testamento ante él: que no se ha demostrado de manera clara y terminante que doña Filomena tuviera el propósito serio y deliberado de otorgar testamento: que los testigos no fueron rogados por ella y sí por doña Mary Quiñones y que no oyeron de los propios labios y boca de la testadora sus disposiciones. Todos estos fundamentos de la sentencia apelada se alega por la recurrente que son erróneos.

Resulta de la prueba que doña Filomena, que era ciega, había otorgado cuatro testamentos ante notario público desde 1908 hasta el 27 de septiembre de 1921 en que otorgó el último de esa clase, dos meses antes de su muerte, y que en todos ellos dejaba sus bienes a instituciones de caridad para la ayuda y protección de personas desvalidas, habiendo instituido en su último testamento notarial por heredero de todos sus bienes al Hospital de la Concepción de San Germán en cuya población vivió y murió: en el testamento de palabra, reducido a escrito, que motiva esta apelación, resultan instituidos como únicos herederos sus sobrinos hijos de siete hermanos cuyos nombres se expresan, y se hacen dos legados que parecen ser de importancia, uno a doña Mary Qui-

ñones y otro a su hermana doña Julia, más otro de mil dólares a favor de Carmen Pagán.

Doña Filomena murió de caquexia senil, o sea, por vejez y desgaste, el 29 de noviembre de 1921, trece días después de otorgado el testamento de palabra del 16 de noviembre. En el juicio se presentó una certificación expedida el 6 de diciembre siguiente por un médico en la que se hace constar que en los días 16 y 17 de noviembre anterior asistió a dicha señora en su domicilio, la que se hallaba en peligro de muerte por caquexia senil pero con sus facultades mentales en funcionamiento normal, habiéndola asistido hasta el día en que murió. En esa certificación, que fué reconocida como cierta en el juicio por el que la suscribe, no se dice que dicha señora estuviese en 16 y 17 de noviembre en peligro inminente de muerte, y contestando dicho médico a las preguntas que se le hicieron en el juicio manifestó que empezó a asistir a dicha señora cuatro o cinco días antes del 16 de noviembre; que en este día la visitó de 2 a 4 de la tarde y la encontró en peligro inmediato de muerte, a cuya conclusión llegó por su pulso, que estaba muy alterado, y porque variaba mucho su respiración; que no tenía enfermedad crónica alguna, pues aunque había tenido una enteritis se logró mejorar, estando mejor de esa diarrea desde el día 15; que después del día 17 estaba más decaída y que ya entonces desvariaba su mente; que el estado de gravedad en que se hallaba el día 16 era el mismo que tenía el día 15; que el día 17 por la noche todavía estaba bien, al menos mentalmente, hablaba y entendía lo que le decían: que desde el día 15 tenía postración física, que era consecuencia natural de su estado de caquexia, estado que continuó aumentando hasta el día 29 en que murió y que desde el día 18 perdió el conocimiento, desvariando su mente. Por su parte los testigos del testamento dijeron; José Rodríguez, que vivía como a un kilómetro de distancia de Luis Pardo, donde los testigos se reunieron y desde allí se tardaban como cinco minutos hasta la casa de doña Filomena; que

Cheo Quilinche, el que dictó el testamento, llegó de Maya-
güez: que hubo tiempo para buscar un notario que hiciera
el testamento; que es mayordomo de una de las legatarias;
que doña Filomena estaba en bastante decadencia y les dijo
que estaba en peligro de muerte, y según el testigo ella es-
taba muriéndose: Nadir Gutiérrez, que ella dijo que se sen-
tía morir y que la testadora estaba muy cerca de la muerte,
en peligro inmediato; Luis Pardo, que ella estaba bastante
decaída pero podía hablar; Luis Alberto Pardo, que ella
dijo que se sentía morir y quería otorgar su testamento, que
la creyó en peligro de morir porque hablaba con fatiga; y
Lope J. Rodríguez declaró en términos parecidos a los ante-
riores.    También resulta que en la fecha del testamento de
palabra había en San Germán cuatro notarios, uno de los
cuales vivía muy cerca de doña Filomena, a cuatro o cinco
minutos de tiempo de una casa a otra.

Dejaremos en este punto la prueba porque a nuestro en-
tender la cuestión fundamental en este asunto es si doña Fi-
lomena estaba en la condición requerida por la ley para
poder otorgar testamento de palabra.

El testamento es uno de los actos más solemnes en la
vida del hombre, pues por él hace sus disposiciones para
después de su muerte, y por esto y para que la expresión
de su voluntad conste de una manera auténtica, de modo
que no pueda ser alterada, el legislador ha establecido cier-
tas reglas y requisitos para la validez de los testamentos,
siendo el testamento ante notario público la forma del tes-
tamento regular, por más que autoriza a prescindir de dicho
funcionario en determinadas circunstancias, siendo una de
éstas la de permitir el artículo 709 del Código Civil que el
testamento se haga de palabra, sin necesidad de notario,
ante cinco testigos idóneos, cuando el testador se hallare en
peligro inminente de muerte; y como esta clase de testamento
es una excepción de la regla general es necesario, para que
pueda ser utilizada esa forma de testar, que ocurra la cir-
cunstancia expresada por la ley, a tal punto que aunque en

efecto se haga un testamento de palabra ante cinco testigos no será válido si la persona que lo otorgue no se hallare en peligro inminente de muerte.

Con respecto a esta clase de testamentos, dice Manresa en sus Comentarios al Código Civil Español (artículo 700), en el tomo 5, páginas 571 y 572 tercera edición, lo siguiente:

"La falta de notario en las pequeñas localidades, la razón de economía, el interés personal, el deseo de ahorrarse molestia y de evitar dilaciones para aprovechar los momentos en que el testador ha manifestado deseos de otorgar su disposición testamentaria, el temor de que éste se arrepienta o desista de ello si hubiera de esperarse la venida de notario, más o menos distante de la población, y otra porción de causas, han contribuido a que se generalice y extienda tanto esta clase de testamentos, especialmente en los pueblos donde no resida notario, que puede decirse que esa forma es la única utilizada en ellos, a pretexto siempre de hallarse el testador en peligro más o menos inminente de muerte.

"Tales abusos, y los perjuicios que mediante ellos puede ocasionarse, exigen un exquisito cuidado y un rigor inflexible por parte de los tribunales llamados a intervenir en la admisión y elevación a escritura pública de dichos testamentos, si no se quiere que volvamos a la época de las cédulas y memorias testamentarias con todos sus inconvenientes, o que con el tiempo la excepción se convierta en regla general y se viole o se eluda el precepto de la ley, haciéndose ineficaces las garantías establecidas en el art. 694 para todos los testamentos abiertos en que no concurran las poderosas razones que han motivado la adopción de las dos especiales modalidades establecidas en los artículos 700 y 701.

"Las condiciones en que se otorgan estos testamentos excepcionales no consienten que se extienda esa facultad más allá de los límites racionales marcados por la misma circunstancia perentoria y extraordinaria que le da nacimiento; y por lo tanto, si la potestad concedida para otorgarlos obedece a la razón de que no mueran intestados los que en tal circunstancia se hallaren, por la imposibilidad de esperar la llegada del notario o de cumplir todas las formalidades que son necesarias para la validez del testamento en otro caso, desde luego se comprende que una vez que desaparezca dicha razón, o sea la inminencia del peligro de muerte, debe cesar la facultad o la excepción indicada.

"En su consecuencia, a nuestro juicio, el precepto de este artículo se refiere única y exclusivamente a aquellos momentos en que la enfermedad es de tanta gravedad, · que se pierde toda esperanza de salvación y no hay lugar a que pueda concurrir el notario; pues pasados esos momentos de peligro, si el enfermo se alivia hasta el punto de poder esperarse la llegada o el concurso del notario, y no hay razón para considerarle en constante e inminente exposición de muerte, entonces falta el motivo que la ley ha tenido para establecer esta causa de excepción, cual es la imposibilidad de la intervención del notario por razón de la premura de las circunstancias.

"Cuando a juicio del tribunal sentenciador no resulta probado que el testador estuviese en las críticas circunstancias que exige el art. 700, el testamento es nulo.    (Sentencia del Tribunal Supremo de 7 de octubre de 1904.)"

Por su parte Scaevola en sus Comentarios al mismo código, tomo 12 (edición 1896), páginas 470 a 472, dice así:

"El peligro en que el testador se halle para poder acogerse a la excepcionalidad con que le brinda el legislador ha de ser urgente, amenazador, inminente, como dice el Código, es decir, que lleve envueltos consigo temores de quizá muy pronta e irreparable realidad. Dicho legislador ha escogido, con tal objeto, la palabra más expresiva y más adecuada para significar el objeto a que venimos refiriéndonos.    Por esto puede decirse que el término *'inminente'* del art. 700 es el que le da carácter y el que probablemente en cada caso litigioso concreto originará dudas y vacilaciones de importancia.

"El conocimiento de la práctica de Tribunales y Juzgados y de lo que ocurre en localidades de reducido vecindario sobre el particular, nos autoriza para dar la voz de alerta, principalmente a los funcionarios del orden judicial en sus primeras categorías cuando intervengan en los expedientes de protocolización y elevación a escritura pública de la clase de testamentos que estudiamos en este comentario.    Es muy corriente el hecho de que tratándose de una persona enferma de algún cuidado, pero que no ofrezca peligro de muerte, ni mucho menos *inminente,* en esas localidades a las que antes aludíamos, y donde se carece de notario, los parientes interesados, algún sujeto oficioso, a veces el mismo testador, consignan la reunión de los cinco testigos que pide el artículo 700 y, burlando los preceptos del Código que establecen el testamento abierto normal para los casos también normales de la vida, muchas veces para evitar

los que juzgan equivocadamente mayores gastos por la venida al lugar del funcionario notarial desde la capital del distrito, adoptan la forma excepcional como ordinaria y corriente, sin considerar quizá que con esto hacen perder toda su severidad y eficacia a los preceptos legales sobre testamentos, dictados con la mira de garantizar la autenticidad de aquéllos, y por consiguiente, con el propósito de favorecer en todo lo posible los intereses de los testadores y de los que esperan confiadamente que, por virtud de la sucesión, se respeten sus legítimos derechos y deseos. Los testigos, llegado el momento de confirmar ante la autoridad judicial las manifestaciones que oyeron de palabra al que consideraron para ese efecto como moribundo, o que vieron escritas en papel que luego se les presenta a fin de que lo reconozcan, aun sin guiarles propósito mal intencionado de faltar al juramento que prestan, declaran, en efecto, que el testador se hallaba en peligro inminente de muerte, no comprendiendo muchas veces el significado exacto de esos términos ni la tendencia o fin a que en el Derecho positivo responde, o no habiendo quien les explique, con frases comprensibles y más vulgares, lo que se quiere indicar con esa frase *'peligro inminente,'* para cerciorarse de si el testador se encontraba en dicho caso.

*     *     *     *     *     *     *

"Y a los jueces de primera instancia nunca insistiremos bastante en recomendarles extraordinario celo y cautela para precaverse contra esos, la mayor parte de las veces, amañados testamentos de última hora que, bajo la fe de cinco infelices y rudos aldeanos, preparan ciertos muñidores de últimas voluntades, fingiendo estados desesperados en la enfermedad del paciente, cuando éste podía entonces dictar sus postreras disposiciones con mayores tranquilidad y solemnidades, sobre todo, bajo la más exacta garantía que proporciona la intervención del notario, del cual se prescinde hasta cuando se halla domiciliado en las proximidades de la residencia del testador."

El requisito exigido por la ley para que una persona pueda otorgar testamento de palabra ante cinco testigos sin la presencia de un notario es que se halle en peligro inminente de muerte, concepto que se halla perfectamente explicado en las citas que hemos hecho y es el mismo que el Diccionario de la Academia Española tiene al definir el adjetivo "inminente" diciendo que es lo que amenaza o está

para suceder prontamente.   Por consiguiente, el peligro de muerte debe ser de tal naturaleza que razonablemente no dé tiempo según las circunstancias para utilizar a un notario porque la muerte puede ocurrir prontamente, en poco tiempo.

El hecho, pues, de que exista un peligro inminente de muerte es bastante por sí solo para prescindir del notario aunque haya alguno en la localidad y aunque resida cerca de la persona que se halle en tal condición por lo que la cuestión a decidir en este caso es si el peligro de muerte de doña Filomena el 16 de noviembre era inminente, de tal naturaleza que su muerte podía ocurrir prontamente, de un momento a otro, o en pocas horas.

En este caso la petición inicial del procedimiento alegó que la testadora estaba en peligro de muerte, sin decir que ese peligro fuera inminente, y la certificación del médico que se presentó en el juicio, que fué reconocida por él, tampoco dice que el 16 de noviembre estuviera doña Filomena en peligro *inminente* de muerte, aunque a las preguntas que se le hicieron en el juicio contestó que cuando la visitó el 16 de noviembre de 2 a 4 de la tarde estaba en peligro inmediato de muerte en cuyo estado se hallaba desde el día 15 y también el 17.   Doña Filomena no tenía enfermedad crónica alguna el día 16 sino solamente vejez con el desgaste natural producido por sus 90 años de edad y a pesar de la muerte inmediata declarada por el médico por la tarde el testamento no fué otorgado hasta 7 ó 9 horas más tarde, las 11 de la noche, después que doña Mary Quiñones fué a Mayagüez en busca de un notario y regresó sin ninguno de los que allí hay por haber encontrado enfermo al que deseaba.

En vista de esos hechos llegamos a la conclusión con la corte inferior de que doña Filomena no estaba en tal peligro inminente de muerte el día 16 de noviembre que la autorizara a otorgar testamento de palabra, prescindiendo de notario, pues no sólo existía dicho estado desde el día anterior sino que también el 17, lo que demuestra que la muerte

no se temía prontamente, y así parece fué entendido por
·el hecho de ir a buscar notario a Mayagüez cuando en la lo-
calidad había cuatro notarios, hechos que parecen demos-
trar que quiso prescindirse de dichos notarios ya que a
cualquiera se le podía ocurrir que era más fácil otorgar un
testamento ante notario por la práctica que deben tener en
la redacción de testamentos que recurrir a cinco testigos,
generalmente inexpertos, que oyeran el testamento y lo es-
cribieran.   En resumen, aunque dijimos anteriormente que
la existencia de notarios en la localidad por sí solo no es
motivo para que no pueda otorgarse testamento de palabra
en caso de peligro inminente de muerte, sin embargo, el
hecho de haber notarios en la localidad y de no utilizarlos,
con otros hechos, tienden a probar que el peligro de muerte
no era inminente.

Además de la declaración del médico respecto al peligro
·de muerte inmediato de doña Filomena los testigos también
·dijeron algo de esto, más bien con referencia a las manifes-
taciones de ella de que sentía morir que por su propio co-
nocimiento, pero esto no era obstáculo para que el juez con
vista de todos los hechos llegara a una conclusión contra-
ria, con la que convenimos, so pena de que se sostenga que
el juez no tiene la facultad de apreciar la prueba y que ne-
cesariamente ha de dar crédito a los testigos y al perito y
que de acuerdo con las manifestaciones de ellos haya de de-
cidir que la testadora estaba en peligro inminente de muerte.

Podríamos dar aquí por terminada esta opinión en este
punto en vista de la conclusión a que hemos llegado, pero
creemos conveniente decir, además, que otro de los motivos
que tuvo el tribunal inferior para su sentencia aparece jus-
tificado por la prueba.   En efecto, el tribunal *a quo* no dió
crédito a los testigos del testamento por su manera de de-
clarar, y examinadas sus declaraciones encontramos que
Luis Pardo afirmó como cierto un hecho que no le constaba
y que era falso, pues testificó que doña Filomena murió al

día siguiente del testamento de palabra, a las 4 de la mañana, cuando lo cierto es que falleció trece días después. José Rodríguez declaró primeramente que doña Filomena quería que su propiedad fuera repartida por igual entre sus sobrinos, y después dijo que ella quería hacer tres legados a los sobrinos y lo demás partido en partes iguales *a los otros sobrinos,* siendo así que según el testamento reducido a escrito instituyó por herederos a *todos* sus sobrinos, a dos de los cuales dejó dos legados, siendo otro para Carmen Pagán, que no consta que sea sobrina. El testamento escrito fué leído dos veces a la testadora, primero por Nadir Gutiérrez, a quien lo dictó Cheo Quilinche, que no figura como testigo, y luego por Lope Rodríguez, y sobre este extremo declaró José Rodríguez que la testadora estuvo conforme cuando se le leyó el testamento y que no sabe por qué se le leyó por segunda vez pero que la testadora pidió que se lo leyeran dos veces. Luis Pardo y Lope Rodríguez dijeron que ella pidió que lo leyera el último de ellos por segunda vez, mientras que Nadir Gutiérrez manifestó que se leyó por segunda vez para leerlo con más perfección y a petición de la testadora porque no lo comprendió bien diciendo luego que fué leído por segunda vez a petición de todos los testigos porque Nadir no lo leyó bien; habiendo declarado el testigo Luis A. Pardo que se leyó por segunda vez para darle más importancia, para que lo oyera bien. También hay contradicción con respecto a quién facilitó el papel para el testamento, pues dicen algunos de los testigos que fué Cheo Quilinche mientras según otros fué doña Mary Quiñones.

En vista de esas contradicciones no nos atrevemos a declarar que el tribunal inferior no estuviera justificado al negarse a dar crédito a los testigos del testamento.

*La sentencia apelada debe ser confirmada.*

Los Jueces Sres. Presidente del Toro y Asociado Hutchison disintieron.